FILED

2006 Nov-15  PM 01:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROBIN SUTTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:05-CV-503-VEH** |
| | ) | |
| **AMERICAN EXHIBITION** | ) | |
| **SERVICES, L.L.C.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Robin Sutter ("Sutter") initiated this lawsuit (Doc. #1) on March 10, 2005.  The initial Complaint consists of five separate counts:  count one is for age discrimination under the Age Discrimination in Employment Act ("ADEA"); count two is for state law age discrimination under the Alabama Age Discrimination in Employment Act ("AADEA"); count three is for gender discrimination and retaliation under Title VII; count four is for intentional infliction of emotional distress under Alabama law; and count five is for negligent hiring, training, supervision, and retention under Alabama law.  Sutter filed an Amended Complaint (Doc. #9) on December 1, 2005, and added two more claims arising under Alabama law:  count six for defamation and count seven for libel and slander.

Pending before the court is Defendant American Exhibition Services, L.L.C.'s ("AES") Motion for Summary Judgment (Doc. #17) filed on July 27, 2006.[1]  Sutter filed her evidentiary submission (Doc. #22) and amended brief in opposition (Doc. #28) on September 12, 2006, and October 2, 2006, respectively.   AES filed its amended reply brief (Doc. #29) on October 6, 2006.  As discussed more extensively below, AES's Motion for Summary Judgment is due to be granted in part and denied in part.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden

---

[1]Also pending before the court is AES's Corrected Motion to Strike Plaintiff's Declarations (Doc. #30) filed on October 6, 2006.  The court addresses this evidentiary motion in a separate Memorandum Opinion and Order also entered on this date.

of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[2]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the

---

[2]Although a claim of discrimination under either Title VII or the ADEA can be established by direct or circumstantial evidence, *Jones v. BE & K Engineering Co.*, 146 Fed. Appx. 356, 358-59 (11th Cir. 2005), Sutter only argues that she has established a circumstantial case of discrimination. (Doc. #28 at 24).

3

defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02. The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   STATEMENT OF FACTS[3]

### A.   Business of AES

AES  provides a niche service in the trade show industry as it attempts to reach agreements with the organizer of a large-scale commercial trade show and "partner" with the show.  AF No. 5.[4]  Once AES reaches an agreement with a trade show

---

[3]These are the facts for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[4]The designation "AF" stands for admitted fact and indicates a fact offered by AES that Sutter has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.  Whenever Sutter has adequately disputed a fact offered by AES, the court has

organizer, AES is then able to sell its advertising goods and services to exhibitors

which have contracted with the organizer to exhibit their products at the show. AF

No. 6. AES offers exhibitors a variety of advertising products and services which

exhibitors utilize to generate awareness of their presence at the show. AF No. 7.

AES pays the organizer a percentage of its revenues generated from sales to

exhibitors. AF No. 8. Since many organizers offer similar advertising products and

services to exhibitors at their shows, AES can only expect to make a profit from

relationships with organizers of the largest commercial trade shows and thus targets

roughly the largest 200 out of approximately 5,000 commercial trade shows which

occur in any given year. AF No. 9.

During the period leading up to Sutter's separation from AES, the company

was experiencing financial difficulties, and Allen Brady ("Brady"), a relative of the

owner of AES, Charles Allen ("Allen"), became involved with AES. (Doc. #16 at Ex.

1 at 16 ("It [*i.e.*, AES] was technically insolvent in all aspects of the word. I [*i.e.*,

Brady] came in and lent my cousin [*i.e.*, Allen] some money. In return for that loan,

accepted Sutter's version. The court's numbering of admitted facts (*e.g.*, AF No. 1)
corresponds to the numbering of AES's Statement of Facts as set forth in Doc. #18
and responded to by Sutter in Doc. #28. Similarly, the designation "AAF" stands for
additional admitted fact and corresponds to Sutter's Statement of Facts contained in
Doc. #28 and responded to by AES in Doc. #29. Any other facts referenced by the
parties that require further clarification are dealt with later in the court's opinion.

he [*i.e.*, Allen] relinquished 45-percent ownership interest to me."))[5]

The functional groups within AES are the Executive group, the Show Central group, the Sales group, the Operations group and the Graphics group.  AF No. 22. The Show Central group was run by Bliss Beasley ("Beasley") and is responsible for identifying trade shows; contacting organizers; and negotiating contracts with the trade show organizers.  AF No. 23.

### B.    Sutter's Employment with AES and Post-Employment

Sutter was originally hired by AES as an administrative assistant after HR Manager Jennifer Pentecost told her there was a position available.  AF No. 14. Subsequently, Sutter voluntarily accepted a promotion from administrative assistant to Director of Administration.  AF No. 15.  Sutter was replaced as administrative assistant by Isaiah Hileman (male, age 24) and although Hileman was eventually laid off by AES, when Sutter was let go, he was still employed by AES.  AF No. 15.

Sutter voluntarily accepted a promotion from the position of Director of Administration to Account Manager/Director of Industrial Relations.  AF No. 16. Sutter was replaced by Shea Mayfield (female, age 26) who was laid off four days

---

[5]Sutter points to the declaration of Allen in an effort to create a material factual dispute as to the financial condition of AES.  However, the substance of Allen's testimony disputes how AES became financial insolvent, not the fact that it had financial problems.  (Doc. #22 at Ex. 1 ¶¶ 5-6).

before Sutter; however AES retained Brian Garrett, a young male, who was hired after Mayfield. AF No. 17. At the time of her departure on or about May 3, 2004,[6] Sutter's pay plan as Account Manager/Director of Industrial Relations position was a salary of $30,000 per year plus a commission structure. AF No. 27.[7]

Sutter acknowledges that Allen entered into an agreement in which she was to be available to him. (*See* Doc. #16 at Ex. 5 at 121 ("But when Charles explained the agreement to me, it was if he needs me for something, I can be available to him. He explained that he was more not [sic] [no longer] an employee.")). Sutter also credits Allen as the driving force behind her promotions. (*See* Doc. #1 at Ex. 1 at 1("All of my promotions were instigated by Charles Allen, co-owner [of AES].")).

Sutter admits that she never applied for a position on the sales staff, but also clarifies that she was never made aware that an open position was available upon her separation from AES, despite her eligibility for rehire. AF No. 48. While AES maintains that Pentecost offered Sutter an administrative position, and after that a sales position, both of which she declined, Sutter denies that she ever received an

---

[6]*See* Doc. #1 at Ex. 1 at 2 ("On May 3, 2004, I was 'laid off' and told the company did not have enough business to support my role.")

[7]Sutter's pay when she started in the position of Account Manager/Director of Industrial Relations was $27,500 with no commission. (Doc. #22 at Exs. 15-16). In November 2003, Sutter requested a raise to $30,000 plus commission which was approved by Beasley. (*Id.*).

offer from AES.  AF Nos. 63-65.

Sutter began working for Allen in January 2005.  (Doc. #22 at Ex. 1 ¶ 8). Shortly after receiving Sutter's Complaint in this case, Brady called Allen and  told him that Sutter had been convicted of embezzlement and warned him to watch his back.  AF No. 59; (Doc. #22 at Ex. 1 ¶¶ 10-11).  After this conversation, Allen advised Sutter that her services would only be needed on a part-time basis.  (Doc. #22 at Ex. 1 ¶ 12).  Sutter never received any compensation from Allen.  (Doc. #16 at Ex. 5 at 50 ("We had an agreement that had not been signed and he came to me and said he [*i.e.*, Allen] couldn't afford to pay me, so I [*i.e.*, Sutter] told him I couldn't afford to work for him.")).

Sutter was actually charged with theft of property by a former employer, after she wrote checks to herself from a business account, informed the employer, and repaid the money.  AAF No. 40.  Sutter had shared with Pentecost her previous criminal history.  AAF No. 41.  Sutter testified that Brady's actions in speaking with Allen caused her to revisit a low point in her life which was a different pain than being terminated.  AAF No. 47.

## C.    AES's Decline and Managerial Conflict

Brady believed that AES's decline was in large part due to Allen's increasingly

erratic personal and professional behavior.  AF No. 19.[8]  During this period, Brady concluded that Allen was partnering with organizers whose shows were too small for AES to make a profit and was entering into contracts which made no sense and were losing large amounts of money.  AF No. 20.[9]  During 2002-2003, Brady attempted to cut costs at AES in order to limit the company's losses and improve the financial health of the company.  AF No. 21.[10]  Allen and  Brady were increasingly in conflict over the direction of the company and a rift developed between them.  AF No. 24. Allen and Beasley were openly hostile to one another and the conflict was sufficient to make Sutter uncomfortable.  AF No. 25.

### C.  Allen's Employment Agreement with AES

In February 2004, Allen and Brady, as Manager for AES, entered into a written Employment Agreement effective January 1, 2004, in which Allen agreed to transfer a portion of his ownership interest to Brady. (Doc. #16 at Ex. 6).[11]  The scope and practical implications of this Employment Agreement are largely in dispute, although

---

[8]While Allen disputes that he was the cause of AES's decline, this evidence does not create a material factual dispute as to  Brady's thoughts and impressions that Allen was the source.

[9]The record citation relied upon by Sutter in opposition is either not on point or does not create a material factual issue.

[10]The record citation relied upon by Sutter in opposition is either not on point or does not create a material factual issue.

[11]The record citation relied upon by Sutter in opposition is either not on point or does not create a material factual issue.

the document does expressly list Frances Stewart,[12] Sutter, Gregory Davis ("Davis"), and Crystal Hembree ("Hembree") as "staff personnel . . . available to assist Employee [*i.e.*, Allen]. (*See* Doc. #16 at Ex. 6 at 207-08).[13]   Sutter acknowledges in her EEOC charge that "Charles Allen sold his interest in [AES] in April 2004[, and] [a]s of that date, Allen Brady was the sole owner of the company."  (Doc. #1 at Ex. 1 at 1).

## IV.   ANALYSIS

### A.   Sutter's Age Discrimination Claims[14]

#### 1.   Sutter's *Prima Facie* Case of Age Discrimination Fails.

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  In order to fall under the ADEA's protections, an employee must be "at least 40 years of age." 29 U.S.C. § 631(a).

---

[12]On May 3, 2005, AES laid Stewart off.  AAF No. 33.

[13]As Sutter points out she, Stewart, Davis, and Hembree did not cease being employees of AES as a result of the Employment Agreement.

[14]As noted in the introduction, Sutter has sued AES for age discrimination under both the ADEA and the AADEA.  (*See* Doc. #1 ¶¶ 19-29).

The Eleventh Circuit has adopted a variation of the *prima facie* case standard articulated by the United States Supreme Court for Title VII claims in *McDonnell Douglas* for cases arising under the ADEA. *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir.1992). "Generally, a plaintiff in a job-reduction case can establish a *prima facie* case by demonstrating: (1) that he was in a protected age group and was adversely affected by an employment decision; (2) that he was qualified for his current position or to assume another position at the time of discharge or demotion; and (3) evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of age in reaching the decision at issue." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990); *see also Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344 (11th Cir. 2003). "Where a particular job position is entirely eliminated for nondiscriminatory reasons, for the plaintiff to prevail against the employer he must show that he was qualified for another available job with that employer; qualification for his current position is not enough." *Earley*, 907 F.2d at 1083. Additionally, Sutter must show that there was an open or available position for which she qualifies. *Edwards v. Baptist Health*, 2005 WL 1331262, *4 (M.D. Ala. 2005); *Bell v. Capital Veneer Works, Inc.*, 2006 WL 626068, *4 (M.D. Ala. Mar. 13, 2006).

Here, there is no dispute that Sutter was in the protected age category or that

11

she was qualified for her position.  AES does challenge Sutter's ability to satisfy the

second and third prongs of her *prima facie* case.  (Doc. #18 at 15).

As to the second prong, AES maintains that it offered Sutter a sales position

and a secretarial position, but that she declined to accept either one.  Sutter responds

that she was never offered a different position after the elimination of hers within the

Show Administration Department.  AES's offering of an alternative position to Sutter

means that an open  or available position existed for which it believed that she was

qualified.  Therefore, sufficient evidence of a material factual dispute over the second

prong is established through AES's evidence on summary judgment.[15]

---

[15]Based upon AES's evidence that it had an available position for which Sutter was qualified, the court does not need to resolve the issue of whether Sutter's position was completely eliminated or reassigned. *Compare Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1442 (11th Cir. 1998) ("As previously noted, our case law expressly holds that, where a plaintiff contends that his position has been consolidated or reassigned to other employees, as has been alleged in this case, he may establish a *prima facie* case by demonstrating that he was qualified for his current position or to assume another position at the time of discharge[.]") *with Hallman v. Reynolds Metals Co.*, 2000 WL 682887, at * 3 (N.D. Ala. 2000) (Blackburn, J.) ("The plaintiff and defendant dispute whether [plaintiff's] previous position was eliminated, or merely consolidated []. Viewing the evidence and drawing reasonable inferences favorable to the plaintiff, this court finds that there is no genuine issue of material fact as to whether [plaintiff's] position was eliminated. Her position was eliminated, with some duties going to [another employee's] position and other duties transferred to [another office location]."); *see also Minton v. American Bank Ins. Group*, 2003 WL 21303330, at *1 (11th Cir. Feb. 6, 2003) ( "[Another employee], Unterreiner[,] absorbed some, but not all, of Minton's responsibilities. He assumed none of Minton's supervisory duties, nor did he assume Minton's title.  Minton's former duties were scattered among several employees, some, like Unterreiner, younger than Minton, and

Turning to the third prong, the court finds that Sutter has failed to present evidence of discriminatory intent to fulfill the third prong of her *prima facie* case.  To satisfy the intent requirement, "the evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining a plaintiff because of his age, or (2) that defendant regarded age as a negative factor in such consideration." *Allison v. Western Union Tel. Co.*, 680 F.2d 1318, 1321 (11th Cir. 1982) (internal citations omitted).

Sutter's admissible evidence that she believes suggests discriminatory intent of age discrimination include:  (1) her and Davis's separation from AES when they were both over the age of forty (40), *i.e.* both of them were forty-three (43);[16] and (2) AES's favorable treatment of other younger employees as compared to her and Davis. The other employees that Sutter relies upon include Brandon Meeks ("Meeks") (age thirty-three (33)), who she claims replaced her; McAlpin (age twenty-six (26)), who AES employed as an administrative assistant; and Vicki Lepore Bishop ("Bishop") (age forty-two (42)), who AES hired to fill a position six months after Sutter's separation from AES.

As an initial matter, to show circumstantial evidence of age discrimination, the

---

some within the same age group. Accordingly, we find that Minton's position was eliminated.").

[16]*See* AAF No. 74.

Eleventh Circuit has held that "[a] *prima facie* case may be established only when there is a basis for inferring that discrimination is the reason for the employment decision and . . . the fact that the replacement was younger than the plaintiff [is not] enough, standing alone, to give rise to that inference." *Pace v. Southern Railway Sys.*, 701 F.2d 1383, 1390 (11th Cir. 1983). Moreover, "'[i]f the replacement is only slightly younger than the plaintiff, then it is less likely that an inference can be drawn.'" *Id.* (quoting *Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir. 1981)). Therefore, to the extent that Sutter relies upon the younger ages of Meeks, McAlpin, and Bishop, to establish a *prima facie* case of age discrimination, that evidence alone is insufficient.

Moreover, Sutter has not adequately demonstrated how Meeks, McAlpin, Bishop, or any other person is a suitable comparator of hers. In the Eleventh Circuit, appropriate comparator analysis is when "the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him." *MacPherson v. University of Montevallo*, 922 F.2d 766, 774 n.16 (11th Cir. 1991); *see also Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1273 (11th Cir. 2004) (clarifying that "[w]hen comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly

14

situated in all relevant respects besides [age], since '[d]ifferent treatment of *dissimilarly* situated persons does not violate civil rights laws.'") (internal and other citations omitted).  As demonstrated below, the  employees relied upon by Sutter as potential comparators held differing positions with varying job duties and pay structures.

### a.    Meeks is not a suitable comparator.

Meeks was hired before Sutter's separation from AES as a member of the sales staff on April 12, 2004.   AF No. 41.   Meeks worked on the sales floor for approximately three (3) months until he transferred to the Show Central group for approximately another three (3) months to provide administrative help to Beasley in the position of National Accounts Manager.  AF Nos. 49-50;[17] (Doc. #16 at Ex. 21). Meeks returned  to the sales floor after AES hired Bishop to be the manager of the Show Central group.  AF No. 56.[18]  Sutter has not produced any admissible evidence to show that Meeks  performed the same job duties and responsibilities that Sutter had previously performed.[19]  Moreover, AES hired Meeks for sales, to which position he

---

[17]The record citation relied upon by Sutter in opposition is either not on point or does not create an admissible material factual issue.

[18]The record citation relied upon by Sutter in opposition is either not on point or does not create an admissible material factual issue.

[19]The record citation relied upon by Sutter in opposition is either not on point or does not create an admissible material factual issue.  At most, Sutter has pointed to evidence from which a reasonable trier of fact could conclude that Meeks may have

ultimately returned upon the hiring of Bishop as manager of the Show Central group.

Accordingly, the positions that Meeks and Sutter held within the Show Central group

were not substantially similar and, therefore, Meeks is not a suitable comparator.

### b.    McAlpin is not a suitable comparator.

McAlpin was a clerical employee who replaced Crystal Hembree and assisted

Allen, when he still was at AES.  AF No. 34.  The rate of pay McAlpin received for

her clerical work was approximately $13.50 per hour with no commission structure.

(Doc. #16 at Ex. 27).[20]   AES also, at least temporarily, reduced her hours upon

Allen's departure from AES; however, AES returned McAlpine to full-time hours for

the period date July 2, 2004.  (*Id.*).  The hourly administrative position that McAlpin

filled is vastly different than the salaried and commissioned Account

Manager/Director of Industrial Relations position held by Sutter.   Accordingly,

McAplin is not a suitable comparator for Sutter.

### c.    Bishop is not a suitable comparator.

AES hired Bishop to be the manager of the Show Central group several months

---

handled some of the accounts that Sutter previously serviced, while McAlpin and
Bishop handled others.  (Doc. #22 at Ex. 19).

[20]The record citation relied upon by Sutter in opposition is either not on point
or does not create a material factual issue.

after Sutter's separation from the company.  (Doc. #16 at Ex. 28).  Sutter and Bishop are within one (1) year of each other in age and both Sutter and Bishop are within the protected status under the ADEA.  Bishop's job duties and responsibilities differ from what Sutter did as an employee of AES.  Bishop received an annual salary of $60,000 plus commission.  (Doc. #16 at Ex. 28).  Sutter has not created a material factual issue as to Bishop's being a suitable comparator in terms of job duties and responsibilities.  Also, Sutter's and Bishop's close proximity in age without more  makes Bishop an ill-suited comparator, and regardless is insufficient to create a material factual issue that Sutter's age was regarded as a negative factor in the decision to end her employment relationship with AES.

### d.    No other employees of AES meet the comparator test.

Similar to Meeks, McAlpin, and Bishop, Sutter has not demonstrated to the court how any other employees of AES meet the comparator test.  In the absence of any suitable comparative evidence, Sutter's *prima facie* case lacks sufficient evidence of any discriminatory intent based upon age.  Therefore, viewing the evidence in the light most favorable to Sutter, the court finds that she has not presented adequate evidence of discriminatory intent from which a reasonable jury could conclude that her job was eliminated or alternatively that she was discharged because of her age or

that AES "regarded age as a negative factor in such consideration." *Allison*, 680 F.2d at 1321.  Accordingly, Sutter has failed to satisfy the third prong of her *prima facie* case of age discrimination, and AES's motion for summary judgment is due to be granted as to counts one and two of her lawsuit for that reason.

> **2.**      **Alternatively, Sutter is unable to show pretext regarding her age discrimination claim.**

Even assuming that Sutter is able to satisfy her *prima facie* burden, AES has articulated a legitimate, non-retaliatory explanation for its decision to eliminate her position and/or to discharge her.  *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir. 1997).  "This intermediate burden is 'exceedingly light.'"  *Id.*  (citing *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir.1994)).  The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced.  *See Cantrell v. Jay R. Smith Manufacturing,* 248 F. Supp. 2d 1126 (M.D. Ala. 2003) (citing *McDonnell Douglas,* 411 U.S. at 802; *Burdine,* 450 U.S. at 253-55)).

Sutter then has the burden to show pretext in the AES's explanation for its decision.  In addressing the issue of pretext, the Supreme Court has stated:

> Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will *always* be adequate

to sustain a jury's finding of liability.  Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148 (emphasis in original).  Therefore, despite a plaintiff's efforts to demonstrate an issue of fact regarding the truthfulness of an employer's asserted justification for an adverse employment decision, judgment as a matter of law in favor of the employer would still be appropriate if the record:  1) conclusively demonstrates some other, nondiscriminatory basis for the decision; or 2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal discrimination took place.

Moreover, as the Eleventh Circuit stated succinctly and unequivocally in *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir. 1991), concerning pretext:

Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA [, Title VII, or § 1981] does not interfere.  Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted). "[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith

believed plaintiff's performance to be unsatisfactory...." *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir.1982) (emphasis in original). *See also Jones*, 874 F.2d at 1540; *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

*Id*. at 1470. Accordingly, while one may debate whether AES's treatment of Sutter reflects the best personnel practices, this court does not sit as a super-personnel board to evaluate the personnel practices of AES (unless those practices are discriminatory) and an employer may even offer subjective reasons to justify an adverse employment action. *Chapman*, 229 F.3d at 1033.

AES's explanation for eliminating the positions of Sutter and Davis is based upon the combination of Allen's departure from AES, Sutter's and Davis's connection to Allen as his staff support, and AES's desire to reduce costs within the company. (Doc. #18 at 20-21). Here, Sutter has presented no (or at a maximum only weak, *see Reeves*, *supra*) admissible evidence tending to show that AES's reasons for eliminating her position and/or letting her go are a pretext for age discrimination.[21]

_____

[21]For example, Sutter heavily relies upon her testimony that she was never told by anyone at AES her inclusion as staff in the Allen Employment Agreement was part of the rationale for eliminating her job. Instead, Sutter notes that the only explanation she received for the elimination of her job was because of budgetary cutbacks. However, the mere omission of disclosing the Employment Agreement's role to Sutter does not create a material factual dispute as to the truth of that factor's being

Moreover, the employees that Sutter has identified as potential comparators fail to establish pretext for the same reasons they fail to establish a *prima facie* case of age discrimination. *See* section IV.A.1.a.-d., *supra*. Therefore, summary judgment in favor of AES on counts one and two of Sutter's Amended Complaint is alternatively appropriate due to her inability to show pretext with respect to her age discrimination claim under the ADEA and AADEA.

**B.    Sutter's Gender Discrimination Claim Under Title VII**

**1.    Sutter's *Prima Facie* Case of Gender Discrimination Fails.**

Sutter's admissible evidence that she believes suggests discriminatory intent of gender discrimination include:  (1) AES's favorable treatment of male employees as compared to her;[22] and (2) the testimony of Allen, who swears that he has heard Brady refer to female employees as "bitches" and state that "men don't cause drama in the workplace."  (Doc. #22 at Ex. 1 ¶ 15).

Turning to AES's treatment of Meeks as comparative evidence, Sutter's

---

a part of the decision-making process on the reduction in force.  Similarly, Sutter resists being formally classified as part of Allen's support staff; however, she is unable to dispute the record evidence that she, Davis, and two (2) other employees were identified to work with him on an as needed basis consistent with the terms of the Employment Agreement.

[22]The other employee that Sutter expressly relies upon is Brandon Meeks (age thirty-three (33)), who she claims  replaced her.

reliance upon him as a comparator is inadequate as a matter of law as discussed in section IV.A.1.a. above.  Moreover, in contrast to her age discrimination claim, AES's similar treatment of Davis does nothing to support her gender claim.  Instead, because Davis is a male and was treated similarly as Sutter, this same evidence tends to disprove her gender discrimination claim.

Therefore, Sutter's main evidence that she believes suggests discriminatory intent of gender discrimination are the negative comments about women that are attributable to Brady through Allen.  The court finds this evidence does not create a material issue of fact.  To be sure, the Eleventh Circuit has held that such protected category-related negative comments that fall below the standard required for direct evidence can nevertheless take an employment discrimination plaintiff through the summary judgment threshold.  But the Eleventh Circuit reached that conclusion in a case in which numerous comments by several different supervisors were coupled with the company's failure to move the plaintiff to another available job.  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530-31 (11th Cir. 1987) (noting that failure to move plaintiff to another job raises issue for trial "[w]hen coupled with the age-related comments allegedly made by the supervisors").

In this case, however, the person responsible for offering Sutter another

position within AES, *i.e.* HR Manager Pentecost,[23] is not the same person, *i.e.* Brady, who is attributed with making comments which could be reasonably construed as evidence of having a discriminatory animus towards women.  Also, unlike *Rollins*, the statements offered by Allen as to Brady's gender-related comments do not circumstantially establish that they were frequently made, much less that they were made by multiple supervisors within AES. *Compare* Doc. #22 at Ex. 1 ¶ 15 ("I have heard Allen Brady refer to the women employees as 'bitches.'  I have also heard Allen Brady state that 'men don't cause drama in the workplace.'") *with Rollins*, 833 F.2d at 1531 ("If, for example, Davis and Thrasher jokingly referred to Rollins' age every day, or almost every day, a factfinder might decide that they had exhibited a bias against older people.  We refuse to hold that remarks of this sort could never raise an issue sufficient to preclude summary judgment.").

Additionally dissimilar to *Rollins*, the testimony offered by Allen does not circumstantially establish that Brady made any gender-related remarks that were specific to Sutter on any other female employees.  *Compare* Doc. #22 at Ex. 1 ¶ 15 *with Rollins*, 833 F.2d at 1530 ("Rollins [the plaintiff] states that on numerous occasions, Davis, production manager Randy Thrasher, and others commented, albeit

---

[23]*See, e.g.*, Doc. #16 at Ex. 1 at 48 ("I [*i.e.*, Allen] didn't make the offer.  I think Jennifer [*i.e.*, Pentecost] might have.  You'd have to ask her.").

jokingly, on her age. They repeatedly asked Rollins, who was the oldest employee in the accounting department, how she liked working 'with a bunch of babies.'").

Thus, this court is left only with stray gender-focused comments that, while generally attributable to Brady, are entirely unrelated to the decisionmaking process of either letting Sutter go or offering her an alternative position at AES. Moreover, the circumstances surrounding these remarks lack sufficient concreteness and specificity, and while the court admitted them for the purposes of consideration on summary judgment, they are simply too attenuated to create a material factual issue as to discriminatory intent, especially in the face of undisputed similarly adverse treatment by AES of Sutter's male counterpart, Davis. *See Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 611 (11th Cir. 1987) (holding supervisor's statement of "at your age, I don't believe you could pass [a physical examination]" is "too attenuated" to employer's hiring practices to be of any "legal significance"). Accordingly, Sutter's gender discrimination claim fails as a matter of law due to her inability to show a *prima facie* case.

### 2. Alternatively, Sutter is unable to show pretext regarding her gender discrimination claim.

Akin to the analysis in section IV.A.2. and consistent with the Supreme Court's decision in *Reeves*, *supra*, Sutter is similarly unable to show a material factual dispute

such  that a reasonable jury could conclude that AES's reasons for eliminating the positions that she and Davis, her male counterpart, held were a pretext to the real reason, *i.e.*, gender discrimination.  Accordingly and alternatively, AES is entitled to summary judgment on Sutter's gender discrimination claim contained in count three of  Sutter's Amended Complaint.

### C.    Sutter's Hostile Environment Claim Under Title VII

Sutter's hostile environment claim is contained within count three of her Amended Complaint.   In her brief in opposition to summary judgment, Sutter "voluntarily dismisses her hostile environment claim."    (Doc. #28 at 34). Accordingly, the court will dismiss that claim with prejudice.

### D.    Sutter's Retaliation Claim Under Title VII

Retaliation under Title VII requires proof of the following *prima facie* elements:  (1) engagement in a statutorily protected activity; (2) occurrence of an adverse employment action; and (3) a causal connection between the protected and adverse employment actions.  *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).  Sutter basis her retaliation claim upon Brady's telephone call to Allen, after receiving notice of Sutter's lawsuit and while Sutter was working for Allen, telling him about Sutter's prior criminal history relating to another employer and warning him to "watch his back."

Material factual disputes preclude the entry of summary judgment in favor of AES on Sutter's Title VII retaliation claim based upon this court's reading of *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (holding that former employees are included within purview of Title VII's anti-retaliation provision) and the more recent opinion of *Burlington Northern & Santa Fe Railway Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405, 2415 (2006), which expanded the scope of what type of adversity may be actionable under a Title VII retaliation claim. *See id.* ("[A] plaintiff must show that a reasonable employee [or former employee] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (citations and internal quotations omitted).

### E.   Sutter's State Law Claims

Sutter's state law claims are premised upon the same factual underpinnings surrounding Allen's conversation with Brady that forms the basis for her retaliation claim.  Comparable to Sutter's retaliation claim, the court concludes that material factual disputes preclude the entry of summary judgment in favor of AES as to her claim for intentional infliction of emotional distress (count four); negligent hiring, training, supervision and retention (count five); and defamation (count six). Additionally, the court does not see in the record where either side has addressed the

viability of count seven for libel and slander.  (Doc. #9 ¶¶ 54-58).  Accordingly, that claim also remains in the case.

## V.   CONCLUSION

As analyzed above, AES's Motion for Summary Judgment is due to be granted in part and denied in part.  More specifically, AES is entitled to summary judgment on Sutter's age claims under the ADEA and the AADEA.  AES is also entitled to summary judgment on Sutter's gender discrimination claim under Title VII. However, due to the presence of material disputed facts, the entry of summary judgment is not appropriate as to Sutter's retaliation claim under Title VII or any of her state law claims.[24]  The court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 15th day of November, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[24]The court notes that some of Sutter's surviving claims appear stronger than others based upon the evidence generated as part of the summary judgment record and the *prima facie* proof needed to sustain those claims.  However, the court still believes that reasonable jurors could differ as to the outcome on each one of them. Moreover, the court would rather reassess any legally deficient claims in the context of a clearer evidentiary picture at trial.